Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2689 | **DATE** | 3/22/2004 |
| **CASE TITLE** | Roquet, et. al. Vs. Arthur Andersen, LLP | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] The minute order, opinion and judgment of 3/2/04 is hereby vacated. For the reasons stated in the attached amended memorandum opinion and order, plaintiffs' motion for summary judgment is denied. Defendant's motion for summary judgment is granted. Enter Amended Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | MAR 2 3 2004 date docketed | 89 |
| ✓ | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | GMA docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| MF | courtroom deputy's initials | date mailed notice | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED
MAR 2 3 2004

DOCKETED
MAR 2 3 2004

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NANCY J. ROQUET and CORETTA ROBINSON, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 02 C 2689 |
| | ) | |
| v. | ) | Judge John W. Darrah |
| | ) | |
| ARTHUR ANDERSEN LLP, | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

Plaintiffs, Nancy J. Roquet and Coretta Robinson, brought a class action suit against Defendant, Arthur Andersen LLP, alleging Defendant violated the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101-2109. On May 22, 2003, Plaintiffs' Cross-Motion for Partial Summary Judgment on the Issue of Existence of Mass Layoff was granted. On August 12, 2003, Plaintiffs' Renewed Motion for Class Certification was granted. Presently before the Court are the parties' cross-motions for summary judgment on the unforeseen circumstances exception to liability under the WARN Act.

The Warn Act requires sixty days' notice before a mass layoff, 28 U.S.C. § 2102(a); in this case, by February 22, 2203 (Def.'s 56.1(a)(3) Statement ¶ 15). The unforeseen circumstances exception reduces or eliminates the Warn Act's sixty-day notice if the mass layoff is "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A).

Andersen was engaged in the business of accounting, auditing and tax services, and

89

speciality consulting in various locations in the United States.[1] (Plaint.'s 56.1(a)(3) Statement ¶ 1). Nancy Roquet was an employee of Andersen from January 7, 2002 to April 24, 2002, at which time her employment was terminated. (Id., ¶ 2). Coretta Robinson was an employee of Andersen from October 6, 1997 to May 15, 2002, at which time her employment was terminated. (Id., ¶ 3).

In June 2001, Andersen entered into an agreement with the United States Securities Exchange, consenting to the entry of a permanent injunction enjoining it from violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10B05 thereunder. (Plaint.'s 56.1(a)(3) Statement ¶ 10). The agreement also required Andersen to pay a $7 million fine. (Id., ¶ 11). Andersen also agreed to allow the Securities & Exchange Commission ("SEC") to enter an order pursuant to Rule 102(e), censuring Andersen for unprofessional conduct. (Id., ¶ 12). The basis for the consent decree was the SEC's finding that Andersen had knowingly or recklessly issued false and misleading, unqualified audit reports on the annual financial statement between 1993 and 1996 for Waste Management, Inc. (Id., ¶ 13).

In November 2001, there were discussions in the media that Andersen might be and was the subject of an SEC investigation in relation to its client Enron Corporation. (Plaint.'s 56.1(a)(3) Statement ¶¶ 14-15). In December 2001, the media was reporting that experts were speculating that Andersen might not survive the SEC's investigation. (Id., ¶ 16). In January 2002, the media reported that Andersen had announced that some of its employees had disposed of or deleted a number of documents related to Enron. (Id., ¶ 17).

---

[1] The underlying facts are fully set forth in this Court's previous dispositions addressing the Defendant's Motion to Dismiss, Defendant's Motion for Summary Judgment, and Plaintiffs' Cross-Motion for Partial Summary Judgment on the Issue of Existence of Mass Layoff. Accordingly, they need not be repeated here; and only those facts relevant to the issue of the existence of the unforeseen circumstances exception are included.

2

Initially, Andersen seeks to strike Plaintiffs' Statements of Undisputed Facts that are based on media reports, including newspapers and radio, because such statements are based on inadmissible hearsay.

Evidence submitted for or in opposition to a motion for summary judgment must be admissible at trial under the Federal Rules of Evidence. *See Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002). "[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (*Eisenstadt*). Hearsay consists of an out-of-court statement offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 802; *Eisenstadt*, 113 F.3d at 742. Media reports, including newspaper articles, that are being offered for the truth of the matter asserted are inadmissible hearsay and cannot be relied upon for summary judgment proceedings. *See Chicago Firefighters Local 2 v. City of Chicago*, 249 F.3d 649, 654 (7th Cir. 2001); *Eisenstadt*, 113 F.3d at 742. Plaintiffs concede that the media reports would generally be considered hearsay but contend that they are admissible because they are not being offered for the truth of the matters asserted but rather to demonstrate constructive knowledge to Andersen of the grounds for a criminal indictment in the early part of 2002. Accordingly, the media reports will be considered only for that limited purpose, *i.e.*, evidence of what was being reported in the media concerning Andersen but not for the truth of the contents of the media reports.

Beginning in January 2002, media outlets were reporting that some of Andersen's employees were concerned about layoffs. (Id., ¶ 19). It was also reported that some of Andersen's clients were contemplating switching or had decided to switch to other auditors. (Id., ¶ 20).

3

As of January 2002, Andersen employed approximately 27,000 persons at over 80 locations throughout the United States. (Def.'s Additional Facts ¶ 5). As of this date, Andersen provided services to clients throughout the United States with annual revenues of about $4 to $4.5 billion. (Id., ¶ 9).

As of February 22, 2002, Andersen representatives were continuing to work with the representatives of the SEC and the Department of Justice ("DOJ") in an attempt to agree upon a global resolution of Enron Corporation-related issues. Such resolution would not have included the return of criminal charges against Andersen. (Def.'s Additional Facts ¶ 3). As of February 22, 2002, the Andersen Administrative Board did not believe that criminal charges against Andersen were probable and expected that a conclusion of matters with the SEC and DOJ would not result in substantial damage to the financial integrity of Andersen. No consideration was being given, at that time, to the termination of large numbers of employees because there was no reason to believe that the workforce needed to be downsized. (Id., ¶ 4). As of February 22, 2002, the energies of the Andersen Administrative Board were directed primarily toward resolving the legal problems of Andersen and keeping client service teams in place with ongoing work for clients. (Id., ¶ 6). As of February 2002, the role of Andersen as a major provider of administrative support services to the Andersen network was intact or "business as usual." (Id., ¶ 7). As of February 22, 2002, Andersen had no factual basis for expecting an indictment was probable, and, if so, when an indictment would occur, and, if so, which and how many clients would withdraw their business and when such clients would withdraw their business. Accordingly, as of February 22, 2002, the extent and identification of persons or groups that would be necessary to layoff 60 days later because of the business damage

from the March 14, 2002 indictment would have been pure guesswork based on what was known by or on February 22, 2002. (Def.'s 56.1(a)(3) Statement ¶ 15).

Between January 1, 2002 and March 14, 2002, only four major clients, other than Enron, had left Andersen with a revenue loss of less than $20 million annually. Andersen's client engagements and retention was in normal limits in keeping with general business conditions; and as of mid-February, almost all clients were still being served. (Def.'s Additional Facts ¶ 6).

On March 1, 2002, the DOJ informed Andersen that it intended to seek an indictment against the firm. This development was a surprise to the Andersen Administrative Board. After March 1, 2002 and through March 13, 2002, discussions occurred on an ongoing basis between Andersen and the DOJ for the purpose of attempting to resolve issues without an indictment of Andersen and a public trial. On March 5, 2002, counsel for Andersen sent a correspondence to the DOJ stating, in pertinent part, "As we have explained to DOJ's investigative team during the last ten days ... a criminal action by DOJ against Andersen will cause the rapid collapse of the firm." (Plaint.'s Additional Facts ¶ 41). On March 7, 2002, Andersen Country Managing Partner, Terry Hatchett, sent a communication to all United States Andersen personnel stating, in part, that no final conclusions had been reached concerning the negotiations with the DOJ. (Def.'s 56.1(a)(3) Statement ¶ 15).

On March 14, 2002, the United States DOJ unsealed an indictment charging Andersen with obstruction of justice. (Plaint.'s 56.1(a)(3) Statement ¶ 22). According to the indictment, on or about and between October 10, 2001 and November 9, 2001, Andersen knowingly and corruptly persuaded and attempted to persuade others to withhold documents and alter, destroy, mutilate, and conceal objects. (Id., ¶ 23).

5

On March 31, 2002, the Andersen Administrative Board decided that severe business conditions resulting from the firm's indictment announced on March 14, 2002, required a large layoff of several thousand employees throughout the United States, effective as soon as local management could perform the necessary review of employee's needs at each employment site, with a target date of April 8, 2002, for the layoffs. (Def.'s 56.1(a)(3) Statement ¶ 13). The business conditions that caused the layoffs included huge client losses between March 15 and March 31, 2002 that accounted for more than $400 million annually in revenues; and many additional client losses were considered to be imminent. Also, on March 28, 2002, Andersen announced that, effective April 2, 2002, the non-United States participants in the Andersen network reduced payments to Andersen for administrative support services by more than 60%. Furthermore, Andersen announced that these support functions were expected to be eliminated entirely within a few months. Andersen attributes these losses to the indictment of Andersen announced on March 14, 2002, arising from the destruction of some of Andersen's documents relating to its work for Enron. (Def.'s 56.1(a)(3) Statement ¶ 14.)

In the period between January 1, 2002 and March 2002, client losses amounted to approximately $5 million annualized, or about 1 to 1-1/2% of annual revenues for the office. However, between March 15, 2002 and March 31, 2002, losses of client business serviced by or out of the Chicago practice group at 33 West Monroe Street amounted to approximately $57 million annualized, or 14% of total annual fees for that office. This was consistent with the losses already being experienced throughout the rest of the United States. (Def.'s 56.1(a)(3) Statement ¶ 16). Based on the acute amount of client losses having occurred between March 15 and March 31, 2002, and further projected client losses, the Chicago practice group was evaluated/analyzed by

management to determine, in light of projected continuing client work and transition needs for departing clients, which employees to retain and which to immediately terminate. Similarly, management in the 33 West Monroe Street employee group, which was performing administrative support services only for the Andersen United States operations, identified its personnel as either needed or no longer needed in light of client losses throughout the United States. (Id., ¶ 17). This evaluation was done as quickly as possible by involved management personnel at several levels; and termination lists, which were subject to many changes from March 31, 2002 to approximately April 5, 2002, were finalized by April 5, 2002, or on the following weekend, to be announced on April 8 or 9, 2002. (Id., ¶ 18).

Because payments for administrative support services to Andersen had been reduced immediately by more than 60% and were to fully phase out over a period of several months, Andersen's function in providing services to the participants in the Andersen network was immediately and drastically reduced. (Def.'s 56.1(a)(3) Statement ¶ 20). These immediate reductions in functions, and payments for those functions, caused the jobs of many employees who had been performing these functions to be immediately eliminated so Andersen was immediately overstaffed at the St. Charles and North Michigan Avenue facilities. (Id., ¶ 21). Commencing with the decision to cut services from Andersen for the benefit of other participants in the Andersen network and reduce payments for such services to Andersen, local management at the St. Charles and North Michigan Avenue facilities began the process of deciding which Andersen employees must be immediately terminated and which and how many should be temporarily retained for what work was anticipated and for possible eventual transition to other participants in the Andersen network. (Id., ¶ 22).

The process of determining who to immediately terminate involved reviews of the records of employees, the jobs they were currently doing, their job skills, and trying to match those skills with what was expected to be temporarily left of functions to be performed at each of these locations for the remaining member firms, including the function of transition activities. (Def.'s 56.1(a)(3) Statement ¶ 23). As to the United States support personnel, the evaluation/analysis process was done as quickly as possible by involved management personnel at several levels. Termination lists which were subject to many changes between March 28 to April 5, 2002, were finalized by April 5, 2002, or on the following weekend, to be announced on April 8 or 9, 2002. (Id., ¶ 24).

On or about April 8, 2002, notices were sent to a number of Andersen's employees, notifying each employee that his or her employment would be terminated at a future date, after a specific period of continued employment and "job search" time. (Plaint.'s 56.1(a)(3) Statement ¶ 4). These notices of termination were sent to employees at three Illinois job sites: 33 West Monroe Street and 225 North Michigan Avenue in Chicago and Andersen's training facility in St. Charles, Illinois. (Id., ¶ 5). Each employee who received a notice of termination on or after April 8, 2002, was given at least two weeks of paid "job search" time. (Id., ¶ 6).

The April 2002 layoffs at the 33 West Monroe Street site were caused by a loss of client business of approximately $50 billion in revenue that occurred in the Chicago practice between March 15-31, 2002. (Def.'s Additional Facts ¶ 1). The layoffs at the North Michigan Avenue and St. Charles sites were caused by Andersen's worldwide network of affiliated firms' "pulling the plug," on March 28, 2002, on Andersen's being their major supplier of administrative support services. (Id., ¶2).

8

The WARN Act requires some employers of 100 or more full-time employees to give at least sixty days' advance written notice of plant closings and mass layoffs to affected employees. 28 U.S.C. § 2102(a). As noted above, this Court has previously determined that the reduction in force on April 8, 2002, at the three Illinois job sites was a mass layoff, as defined by the WARN Act. It is undisputed that Andersen did not give employees terminated during the mass layoff sixty days' prior notice. The single remaining issue is whether the WARN Act's sixty-day notice is either reduced or eliminated because the mass layoff was "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). Here, the inquiry is whether the business circumstances that caused the mass layoff were reasonably foreseeable on or before February 22, 2002.

Whether this provision, generally known as the "unforeseeable business circumstance exception," applies requires a two-step analysis: causation and foreseeability. *See Jurcev v. Central Comm. Hosp.*, 7 F.3d 618, 622-24 (7th Cir. 1993). The provision is narrowly construed, and the employer relying on the provision bears the burden of persuasion. *See Local Union 7107 v. Clinchfield Co.*, 124 F.3d 639, 640-41 (4th Cir. 1997) (*Clinchfield*); *Pena v. American Meat Packing Corp.*, 258 F. Supp. 2d 864, 871 (N.D. Ill. 2003) (*Pena*).

## CAUSATION

Plaintiffs argue that the causes of the mass layoff were multiple and preceded the announcement of the indictment, including Andersen's destruction of documents between October 10 and November 9, 2001, the publicity surrounding Andersen's destruction of documents beginning on January 10, 2002, and Andersen's consequent loss of clients to competitors. Andersen argues that the publication of the indictment on March 14, 2002, caused the mass layoff because it

9

was only after this time that Andersen lost a substantial number of clients and was no longer operating within normal business ranges.

Andersen concedes that it was common knowledge in January and February of 2002 that some of Andersen's employees had been involved in the destruction of Enron-related documents, that Andersen was under investigation by the DOJ, and that an indictment might be returned as a result thereof. However, during this time period, which was prior to the publication of the indictment, the undisputed facts show that Andersen had lost only a small portion of its business, that Andersen was operating within the normal business ranges, and that Andersen continued to provide support services for Andersen's worldwide network. There is no evidence of the final dramatic downturn prior to the announcement of the indictment. Rather, the facts are decidedly to the contrary. As such, the evidence clearly demonstrates that it was only after the publication of the indictment that Andersen lost a substantial portion of its client base, that Andersen was no longer operating within normal ranges of business, and that Andersen could no longer provide support service for Andersen's worldwide network.

## FORESEEABILITY

Andersen has shown that the cause of the mass layoffs was the announcement of the indictment on March 14, 2002. Andersen must also show that the announcement of the indictment was "not reasonably foreseeable" on February 22, 2002, the undisputed date on which notice of the mass layoff would have otherwise been required. See 29 U.S.C. § 2101(b)(2)(A). "An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control." 20 C.F.R. § 639.9(b)(1). "The test for determining when business circumstances are not

reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market." 20 C.F.R. § 639.9(b)(2).

Plaintiffs argue that the indictment and resulting loss of business were reasonably foreseeable by Andersen on February 22, 2002, because Andersen knew there was a likelihood of an indictment in light of the destruction of documents and Andersen's attempts to dissuade the DOJ from bringing the indictment. Specifically, Plaintiffs refer to correspondence by Andersen's counsel of March 5, 2002, set out above, which refers to Andersen's representations to the DOJ investigations "within the last 10 days" predicting an indictment of Andersen would cause Andersen's collapse. However, assuming this letter demonstrates an awareness by Andersen of the loss of business in the catastrophic amount which later occurred, the letter refers to a period of time beginning the day after February 22, 2002.

Defendant further argues that the indictment and resulting loss of business were not reasonably foreseeable on February 22, 2002, because as of February 22, 2002, the DOJ had not yet decided if it was going to seek an indictment and Andersen had not suffered significant business loss and was operating "business as usual." In other words, while the possibility of an indictment existed, if and when such an indictment would be filed and against whom, and which clients and how many would react to the indictment would have been guesswork by Andersen. "[T]the WARN Act deals in probabilities, not possibilities." *Pena*, 258 F. Supp. 2d at 873, citing *Halkias v. General Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998) (*Halkias*).

Generally, even if an employer is aware that an event might occur that would cause a business to shut down, such an event may still be deemed sudden, dramatic or unexpected. *See*

11

*Pena*, 258 F. Supp. 2d at 873. In *Jurcev*, the Court found that even though the employer "had long been aware" of the events that led to the cause of the closure, the cause was still sudden, dramatic, and unexpected. *See Jurcev*, 7 F.3d at 626; *see also Clinchfield*, 124 F.3d at 641-42 (despite ongoing contractual problems with employer's primary purchaser of coal, employer could not foresee sixty days in advance that coal purchaser would offer a purchase price that was economically impossible for the employer to accept); *Hotel Employees & Restaurant Employees Int'l Union Local 54 v. Elsinore Shore Assoc.*, 173 F.3d 175, 186 (3rd Cir. 1999) (*Elsinore*) (despite ongoing disputes with the Casino Control Commission and the possibility that the Commission could close the employer, Commission's closure of the employer was not reasonably foreseeable); *Halkias*, 137 F.3d at 337; *Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056, 1062-63 (8th Cir. 1996) (*Loehrer*) (employer's awareness of possibility that contract would be cancelled did not make subsequent cancellation of contract a foreseeable probability).

In the instant case, prior to February 22, 2002, Andersen, as well as the general public, including Andersen's clients, was aware of the 2001 Waste Management consent decree, that Andersen was alleged to have destroyed documents in relation to its client Enron, that the DOJ was investigating Andersen, that the possibility of an indictment existed, and that an indictment would likely have major negative effects on Andersen's viability as a company. However, at this time, Andersen was operating within the normal ranges of its business.

Although Andersen's counsel met with the DOJ on February 22, 2002, there were no pertinent facts that Andersen learned as to whether the DOJ was going to seek or file an indictment or when, if ever, an indictment might be returned. It was only on March 1, 2002, that the DOJ informed Andersen of its intent to indict Andersen as a company.

12

Based on the above undisputed facts, the possibility of an indictment existed as of February 22, 2002. However, if an indictment would be filed, when it would be filed, and how long it would take for clients to react to the filing of the indictment were unknown; and there is no evidence supporting the claim that as of February 22, 2002, the mere possibility of the indictment became a reasonable probability. "[J]ust because additional administrative action was *possible* ... did not make it *probable* that closure would occur when it did ... Similarily, just because [a business] was on notice that there were problems at the plant, did not make it foreseeable that it would shut down *when it did.*" *Pena*, 258 F. Supp. 2d at 873-74 (citations omitted, emphasis in original).

Plaintiffs rely upon *Carpenters Dist. Council of New Orleans v. Dillard*, 15 F.3d 1275 (5th Cir. 1994) (*Dillard*). In *Dillard*, the Court held that the merger of two companies which caused the mass layoff was not unforeseeable to the corporations that were promoting and working toward the merger. *Dillard*, 15 F.3d at 1282. Here, in contrast, Andersen had no control over the return of the indictment which caused the mass layoff and, in fact, had attempted to prevent the DOJ from doing so.

In *Jurcev*, the court held that a foundation's decision to discontinue support of the defendant hospital which caused the mass layoff was beyond the hospital's control. *See Jurcev*, 7 F.3d at 625. "An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition *outside the employer's control.*" 20 C.F.R. § 639.9(b)(1) (emphasis added). As in *Jurcev*, the ultimate decision of the DOJ to indict Andersen *as an entity*, which caused the mass layoff, was completely beyond the control of Andersen.

13

Finally, a determination of the foreseeability of the causal business circumstances must consider the reasonableness of Andersen's business judgment in context with the relevant facts. "The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market." 20 C.F.R. § 639.9(b)(2). To hold that Andersen should have given Section 2102(a) notice by February 22, 2002, weeks before the full extent of the consequences of the indictment became known at the end of March 2002, would not be consistent with the exercise of commercially reasonable business judgment.

Based on the above, the undisputed facts establish that the April 8, 2002 mass layoffs were not reasonably foreseeable by Andersen. Accordingly, Andersen is not liable under the WARN Act. Plaintiffs' Motion for Summary Judgment is denied. Defendant's Motion for Summary Judgment is granted.

Dated: March 22, 2004

JOHN W. DARRAH
United States District Judge